# LEWIS v. CITY OF NEW ORLEANS

No. 72–6156. Argued December 10, 1973—
Decided February 20, 1974

BRENNAN, J., delivered the opinion of the Court, in which DOUG-LAS, STEWART, WHITE, and MARSHALL, JJ., joined. POWELL, J., filed an opinion concurring in the result, *post*, p. 134. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 136.

*John Wilson Reed* argued the cause and filed a brief for appellant.

*Servando C. Garcia III* argued the cause for appellee. With him on the brief was *Blake G. Arata.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Upon the Louisiana Supreme Court's reconsideration of this case in light of *Gooding* v. *Wilson*, 405 U. S. 518 (1972), pursuant to our remand, 408 U. S. 913 (1972), that court, three judges dissenting, again sustained appellant's conviction upon a charge of addressing spoken words to a New Orleans police officer in violation of New Orleans Ordinance 828 M. C. S. § 49–7, 263 La. 809, 269 So. 2d 450 (1972).[1] We noted probable jurisdiction, 412 U. S. 926 (1973), and we reverse. We hold that § 49–7, as construed by the Louisiana Supreme Court, is overbroad in violation of the First and Fourteenth

---

[1] On January 3, 1970, appellant and her husband were in their pickup truck following a police patrol car that was taking their young son to a police station after his arrest. An Officer Berner in another patrol car intercepted and stopped the truck. Berner left his car and according to his testimony, asked the husband for his driver's license. Words were exchanged between Berner and appellant and Berner arrested appellant on a charge of violating § 49–7. The parties' respective versions of the words exchanged were in sharp contradiction. Berner testified that appellant left the truck and "started yelling and screaming that I had her son or did something to her son and she wanted to know where he was. . . . She said, 'you god damn m. f. police—I am going to [the Superintendent of Police] about this.' " App. 8. Appellant's husband testified that Berner's first words were "let me see your god damned license. I'll show you that you can't follow the police all over the streets.' . . . After [appellant] got out and said 'Officer I want to find out about my son.' He said 'you get in the car woman. Get your black ass in the god damned car or I will show you something.' " App. 27. Appellant denied that she had used "any profanity toward the officer." App. 37. The Municipal Judge credited Berner's testimony and disbelieved appellant and her husband.

Amendments and is therefore facially invalid. Section 49–7 provides:

"It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty."

The Louisiana Supreme Court on remand did not refine or narrow these words, but took them as they stood: "The proscriptions are narrow and specific—wantonly cursing, reviling, and using obscene or opprobrious language." 263 La., at 827, 269 So. 2d, at 456. Nonetheless, that court took the position that, as written, "it [§ 49–7] is narrowed to 'fighting words' uttered to specific persons at a specific time . . . ." *Id.*, at 826, 269 So. 2d, at 456. But § 49–7 plainly has a broader sweep than the constitutional definition of "fighting words" announced in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942), and reaffirmed in *Gooding* v. *Wilson*, *supra*, at 522, namely, "those [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace." That the Louisiana Supreme Court contemplated a broader reach of the ordinance is evident from its emphasis upon the city's justification for regulation of "the conduct of any person towards a member of the city police while in the actual performance of his duty . . . . Permitting the cursing or reviling of or using obscene or opprobrious words to a police officer while in the actual performance of his duty would be unreasonable and basically incompatible with the officer's activities and the place where such activities are performed." 263 La., at 825, 269 So. 2d, at 456.[2]

---

[2] We have no occasion in light of the result reached to address the conflict between this view and that of the framers of the Model Penal Code that suggests that even "fighting words" as defined by

At the least, the proscription of the use of "opprobrious language," embraces words that do not "by their very utterance inflict injury or tend to incite an immediate breach of the peace." That was our conclusion as to the word "opprobrious" in the Georgia statute held unconstitutional in *Gooding* v. *Wilson,* where we found that the common dictionary definition of that term embraced words "conveying or intended to convey disgrace" and therefore that the term was not limited to words which "by their very utterance inflict injury or tend to incite an immediate breach of the peace." 405 U. S., at 525. The same conclusion is compelled as to the reach of the term in § 49–7, for we find nothing in the opinion of the Louisiana Supreme Court that makes any meaningful attempt to limit or properly define—as limited by *Chaplinsky* and *Gooding*—"opprobrious," or indeed any other term in § 49–7. In that circumstance it is immaterial whether the words appellant used might be punishable under a properly limited statute or ordinance. We reaffirm our holding in *Gooding* v. *Wilson, supra,* at 520–521, in this respect:

"It matters not that the words [appellant] used might have been constitutionally prohibited under a narrowly and precisely drawn statute. At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' . . . the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making

*Chaplinsky* should not be punished when addressed to a police officer trained to exercise a higher degree of restraint than the average citizen. See Model Penal Code § 250.1, Comment 4 (Tent. Draft No. 13, 1961).

the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity' . . . . This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression."

In sum, § 49–7 punishes only spoken words. It can therefore withstand appellant's attack upon its facial constitutionality only if, as authoritatively construed by the Louisiana Supreme Court, it is not susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments. *Cohen* v. *California,* 403 U. S. 15, 18–22 (1971); *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 (1949); *Gooding* v. *Wilson, supra,* at 520. Since § 49–7, as construed by the Louisiana Supreme Court, is susceptible of application to protected speech, the section is constitutionally overbroad and therefore is facially invalid.

The judgment of the Louisiana Supreme Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, concurring in the result.

I previously concurred in the remand of this case, 408 U. S. 913 (1972), but only for reconsideration in light of *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). Pursuant to the remand order, we now have the Louisiana Supreme Court's decision construing New Orleans Ordinance 828 M. C. S. § 49–7. I agree with the Court's conclusion today that the Louisiana Supreme Court "did not refine or narrow these words [of the ordinance], but took them as they stood." *Ante,* at 132. In conclusory language, that court construed the ordinance to create

a *per se* rule: Whenever "obscene or opprobrious language" is used "toward or with reference to any member of the city police while in the actual performance of his duty," such language constitutes "fighting words" and hence a violation without regard to the facts and circumstances of a particular case. As so construed, the ordinance is facially overbroad.

Quite apart from the ambiguity inherent in the term "opprobrious," words may or may not be "fighting words," depending upon the circumstances of their utterance. It is unlikely, for example, that the words said to have been used here would have precipitated a physical confrontation between the middle-aged woman who spoke them and the police officer in whose presence they were uttered. The words may well have conveyed anger and frustration without provoking a violent reaction from the officer. Moreover, as noted in my previous concurrence, a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." 408 U. S. 913. See Model Penal Code § 250.1, Comment 4 (Tent. Draft No. 13, 1961).

This ordinance, as construed by the Louisiana Supreme Court, confers on police a virtually unrestrained power to arrest and charge persons with a violation. Many arrests are made in "one-on-one" situations where the only witnesses are the arresting officer and the person charged. All that is required for conviction is that the court accept the testimony of the officer that obscene or opprobrious language had been used toward him while in performance of his duties.* Indeed, the language need

---

*The facts in this case, and particularly the direct conflict of testimony as to "who said what," well illustrate the possibility of abuse. *Ante,* at 131 n. 1.

not be addressed directly to the officer since the ordinance is violated even if the objectionable language is used only "with reference to any member of the city police."

Contrary to the city's argument, it is unlikely that limiting the ordinance's application to genuine "fighting words" would be incompatible with the full and adequate performance of an officer's duties. In arrests for the more common street crimes (*e. g.*, robbery, assault, disorderly conduct, resisting arrest), it is usually unnecessary that the person also be charged with the less serious offense of addressing obscene words to the officer. The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.

I therefore concur in the result.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Mr. Justice Holmes aptly observed:

"All rights tend to declare themselves absolute to their logical extreme." *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 355 (1908).

The extreme to which we allow ourselves to be manipulated by theory extended to the end of logic is exemplified by the Court's opinion in this case and in its blood brother of two years ago, *Gooding* v. *Wilson*, 405 U. S. 518 (1972). The "overbreadth" and "vagueness" doctrines, as they are now being applied by the Court, quietly and steadily have worked their way into First Amendment parlance much as substantive due process did for the "old Court" of the 20's and 30's. These doctrines are being invoked indiscriminately without regard to the nature of the speech in question, the possible effect the statute or

ordinance has upon such speech, the importance of the speech in relation to the exposition of ideas, or the purported or asserted community interest in preventing that speech. And it is no happenstance that in each case the facts are relegated to footnote status, conveniently distant and in a less disturbing focus. This is the compulsion of a doctrine that reduces our function to parsing words in the context of imaginary events. The result is that we are not merely applying constitutional limitations, as was intended by the Framers, and, indeed, as the history of our constitutional adjudication indicates, but are invalidating state statutes in wholesale lots because they "conceivably might apply to others who might utter other words." *Gooding* v. *Wilson,* 405 U. S., at 535 (dissenting opinion).

The application of this elliptical analysis to *Gooding* and to this case is instructive. In *Gooding,* officers were attempting to restore public access to a building when they were met by physical resistance and loud, personal abuse: "White son of a bitch, I'll kill you," "You son of a bitch, I'll choke you to death," and "You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." The defendant was convicted under a Georgia statute which provided that any person "who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor." The Court seized upon dictionary definitions and language of Georgia court decisions from the turn of the century. It concluded that the statute swept beyond the bounds of the "fighting words" limitation of *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942), despite the fact that the language of the statute virtually tracked the language used by the *Chaplinsky* Court to describe words properly subject to some regulation, and without any demonstra-

tion in reason how "the narrow language of the Georgia statute has any significant potential for sweeping application to suppress or deter important protected speech." 405 U. S., at 529 (BURGER, C. J., dissenting).

In the present case, appellant and her husband were stopped by a police officer. Appellant's and the officer's respective versions of the incident are conflicting, but the municipal judge credited the officer's testimony. That finding, of course, on this record, is binding upon us. The officer testified that while he was waiting for appellant's husband to produce his driver's license, appellant came out of their truck "and started yelling and screaming that I had her son or did something to her son and she wanted to know where he was. I said 'lady I don't have your son and I am not talking to you. I am talking to this man and you can go sit in the truck.' She said 'you god damn m. f. police—I am going to Giarrusso [the police superintendent] to see about this.' I said 'lady you are going to jail—you are under arrest.' She said 'you're not taking me to jail' and she started to get back in the cab of the truck and I caught up to her while she was getting in the cab. I attempted to take her and she started fighting and swinging her arms." App. 8. A fight ensued and appellant was subdued with the help of another officer. Appellant was charged with resisting arrest and with wantonly reviling the police. She was convicted on both charges but appealed only the conviction of wantonly reviling the police.

We remanded this case to the Supreme Court of Louisiana to construe the meaning of the ordinance.[1]

---

[1] "Section 49-7. *Cursing, etc., police prohibited.*

"It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty."

408 U. S. 913 (1972). That court, after reviewing the applicable precedents, including *Chaplinsky* and *Gooding,* specifically construed the ordinance as "not offensive to protected speech; it is narrowed to 'fighting words' uttered to specific persons at a specific time; it is not overbroad and is therefore not unconstitutional. . . . Any reasonable man knows what it is to wantonly curse or revile . . . . *The Section definitely does not sweep within its proscriptions all forms of abusive and derogatory speech.*" 263 La. 809, 826–827, 269 So. 2d 450, 456 (emphasis in original).

Again, setting the facts to one side, this Court selectively dissects the wording of the Louisiana Supreme Court opinion, eyes the word "opprobrious," refers us to its treatment of "opprobrious" in *Gooding,* observes that "§ 49–7 plainly has a broader sweep than the constitutional definition of 'fighting words' announced in *Chaplinsky,*" *ante,* at 132, and concludes that "we find nothing in the opinion of the Louisiana Supreme Court that makes any meaningful attempt to limit or properly define—as limited by *Chaplinsky* and *Gooding*—'opprobrious,' or indeed any other term in § 49–7." *Ante,* at 133. And, again, the ordinance is struck down with no discussion of whether it might significantly affect protected speech, and no reasons why the State's interest in public peace and the harmonious administration of its laws should not prevail over a lone, individual claim that the ordinance is unconstitutional as applied to others. I cannot reconcile what the Court says with what the Louisiana Supreme Court has said. I believe my Brethren of the majority merely seek a result here, just as I was convinced they sought a result in *Gooding.*

Mr. Justice Jackson warned of the dangers of this kind of constitutional analysis:

"But I did not suppose our function was that of a council of revision. The issue before us is whether

what has been done has deprived this appellant of a constitutional right. It is the law as applied that we review, not the abstract, academic questions which it might raise in some more doubtful case." *Saia* v. *New York*, 334 U. S. 558, 571 (1948) (dissenting opinion).

Overbreadth and vagueness in the field of speech, as the present case and *Gooding* indicate, have become result-oriented rubberstamps attuned to the easy and imagined self-assurance that "one man's vulgarity is another's lyric." *Cohen* v. *California*, 403 U. S. 15, 25 (1971). The danger is apparent. Inherent in the use of these doctrines and this standard is a judicial-legislative confrontation. The more frequent our intervention, which of late has been unrestrained, the more we usurp the prerogative of democratic government. Instead of applying constitutional limitations, we do become a "council of revision." If the Court adheres to its present course, no state statute or city ordinance will be acceptable unless it parrots the wording of our opinions.

This surely is not what the Framers intended and this is not our constitutional function. I would adhere to what Mr. Justice Murphy, a known champion of First Amendment freedoms, wrote for a unanimous bench in *Chaplinsky*, 315 U. S., at 571–572:

> "Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting'

words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut*, 310 U. S. 296, 309–310." (Footnotes omitted.)

The speech uttered by Mrs. Lewis to the arresting officer "plainly" was profane, "plainly" it was insulting, and "plainly" it was fighting. It therefore is within the reach of the ordinance, as narrowed by Louisiana's highest court. The ordinance, moreover, poses no significant threat to protected speech. And it reflects a legitimate community interest in the harmonious administration of its laws. Police officers in this day perhaps must be thick skinned and prepared for abuse, but a wanton, high-velocity, verbal attack often is but a step away from violence or passioned reaction, no matter how self-disciplined the individuals involved. In the interest of the arrested person who could become the victim of police overbearance, and in the interest of the officer, who must anticipate violence and who, like the rest of us, is fallibly human, legislatures have enacted laws of the kind challenged in this case to serve a legitimate social purpose and to restrict only speech that is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Chaplinsky, supra,* at

572.[2] In such circumstances we should stay our hand and not yield to the absolutes of doctrine.

I see no alternative to our affirmance, and I therefore dissent.

---

[2] The suggestion that the ordinance is open to selective enforcement is no reason to strike it down. Courts are capable of stemming abusive application of statutes. See, *e. g., Norwell* v. *City of Cincinnati,* 414 U. S. 14 (1973). Questions of credibility, moreover, have been resolved by courts for centuries and there is no reason to believe the so-called modern age requires any different treatment.