Chico CONCHITO, Appellant,

v.

The CITY OF TULSA, Appellee.

No. M–73–391.

Court of Criminal Appeals of Oklahoma.

April 18, 1974.

James O. Goodwin, Tulsa, for appellant.

Waldo F. Bales, City Atty., Jack Morgan, Chief Prosecutor, Tulsa County, for appellee.

## OPINION

BRETT, Judge:

The appellant, Chico Conchito, hereinafter referred to as defendant, was charged, tried and convicted in the Municipal Court, City of Tulsa, Tulsa County, in Case No. 153732 for the crime of Using Profane and Obscene Language Which Insulted and Offended a Person, in violation of Title 27, Section 122, of the Tulsa Revised Ordi-

nances. He was sentenced to pay a fine of One Hundred Fifty ($150.00) Dollars and to serve a term of Ninety (90) days in the city jail, after a trial before the judge, said sentence being suspended. A timely appeal has been perfected to this Court.

This appeal draws into question the facial constitutionality of Section 122, of the Tulsa Revised Ordinances which provides:

> "It shall be an offense for any person to use or utter any profane or obscene language or proposal when any person hearing such is insulted or offended thereby, regardless to whom such is directed."

The defendant's conviction thereunder resulted from his addressing to the manager of a retail store the words, "mother fucker, I know my rights," following a heated argument over whether the store had kept its promise to properly repair a pair of trousers he had purchased and whether he was entitled either to be given a different pair of trousers or to have his money refunded. The store manager testified at trial that following defendant's outburst, "we took the pants out and inspected them again . . . and he was still very, very hostile about it. . . . so at that time, I was very enraged, and at that time I did call the police." (Tr. 10) He further testified that the epithet used by the defendant had insulted and offended him.[1]

The defendant challenges the city ordinance as overbroad on its face in violation of the guarantee of freedom of expression of the First Amendment.

Section 122 punishes speech alone, therefore, the defendant has standing to attack the overbreadth of that ordinance, although the words he used might have been constitutionally punishable under a narrow, precisely drawn provision because, "the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 418 (1972) quoting Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22, 31 (1965). See also Lewis v. City of New Orleans, —— U.S. ——, 94 S.Ct. 970, 972, 39 L.Ed.2d 214, 219 (1974).

The overbreadth doctrine is founded upon the principle of substantive due process which forbids governments to prohibit certain freedoms guaranteed by the Constitution.[2] A penal provision violates this doctrine when, as drafted or construed, it is susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments. Lewis v. City of New Orleans, —— U.S. ——, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Cohen v. California, 403 U.S. 15, 18–21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). In N. A. A. C. P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963), the United States Supreme Court

---

1. It is perhaps of some interest that the defendant was a young black man and the complaining witness a white man. The prosecution at trial emphasized through direct examination of that witness that the store was in a black neighborhood. The complaining witness testified that he had heard the epithet "m.f." more times in the several weeks he had worked at that store than he had previously in his entire life. He testified that each time, except one, the offending word was spoken by a black person. The complaining witness testified that when the police arrived, he told Conchito if he would tell the police he had spoken the word complained of, he wouldn't have him arrested. Conchito denied then and at trial that he had used the offending term.

2. The First Amendment doctrine of overbreadth, while not always separable from the void-for-vagueness doctrine, is nonetheless a distinct concept which flows from a separate Constitutional principle. See Note, the First Amendment Overbreadth Doctrine, 83 Harv. L.Rev. 844, 845, 871–75 (1970); Note, the Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 110–113 (1960).

articulated the rationale for the overbreadth doctrine in these words:

"These [First Amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

Thus, while freedom of speech is by no means absolute, the necessity of providing such "breathing space" for First Amendment freedoms requires that only threats of a serious substantive evil be proscribed.[3] Therefore, an ordinance which undertakes to punish speech may be upheld only by the showing of a compelling state interest,[4] and the words made punishable by such a provision must come with certain specific and "narrowly limited classes of speech." Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, 1035 (1942).

The ordinance before us has never been construed by this Court. It is plain that in an area in which government may regulate "only with narrow specificity" (N. A. A. C. P. v. Button, 371 U.S. at 433, 83 S.Ct. at 338, 9 L.Ed.2d at 418), this is no narrowly drawn provision. The language proscribed need not be loud or boisterous, or uttered in public. There is no requirement that it be uttered with the knowledge that someone is within hearing who might be offended. The ordinance has only two elements: first, that the language uttered be profane or obscene and, second, that someone hearing the same be insulted or offended thereby. On its face, the ordinance makes punishable the language of the "hapless stonemason who, after crushing his toe, innocently utters a few relieving expletives"[5] as well as the public speaker who punctuates a political speech with a vulgarity chosen because it helps to convey "otherwise inexpressable emotions."[6]

We have carefully examined the recent Supreme Court decisions in this area and conclude that Section 122, as drafted, is unconstitutionally broad. See Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L. Ed.2d 408 (1972); Lewis v. City of New Orleans, —— U.S. ——, 94 S.Ct. 970, 39 L. Ed.2d 214 (1974); cf. Rosenfield v. New Jersey, 408 U.S. 901, 92 S.Ct. 2479, 33 L. Ed.2d 321 (1972); Brown v. Oklahoma, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972).

We have no doubt, in view of Cohen v. California, supra, Gooding v. Wilson, supra, and the progeny of each, that the provisions of the ordinance before us make punishable constitutionally protected speech, and that a conviction under it is not sustainable unless the ordinance may be fairly construed to require something more than the utterance of a profane or obscene word which offended or insulted someone who heard it.

The question then becomes whether, by applying the rules of statutory construction in light of the presumption that its drafters intended the ordinance to be consistent with the Constitution, this ordinance can be narrowed by construction so that it is not susceptible to speech protected by the First and Fourteenth Amendments.

The City of Tulsa, in its brief, brings to the attention of this Court the provisions

3. In Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131, 1134 (1949), the court held that "public inconvenience, annoying or unrest" is not sufficient evil to justify punishing speech. "[F]reedom of speech, though not absolute, . . . is never the less protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest."

4. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

5. Williams v. District of Columbia, 136 U.S. App.D.C. 56, 419 F.2d 638, 644 (1969).

6. Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284, 294 (1971).

of 21 O.S.1971, § 1363 [7] and urges that the city ordinance must be construed as protecting the same compelling state interest as that statute, that is, preventing abusive language from so insulting or offending another that a breach of the peace results because the addressee retaliates with immediate physical violence. Thus, the City urges, the ordinance is designed to prohibit only "fighting words" and, hence, falls within the purview of the landmark decision of Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

As the Supreme Court reaffirmed in Gooding v. Wilson, supra, that language categorized as "fighting words" is one of the "narrowly limited classes of speech" (Chaplinsky v. New Hampshire, 315 U.S. at 571, 62 S.Ct. at 769, 86 L.Ed. at 1035) which the States have the power to punish consistently with the First and Fourteenth Amendments. In Chaplinsky, supra, the Supreme Court sustained a conviction under Chapter 378, Section 2, of the Public Laws of New Hampshire, which provided:

> "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him any offensive or derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name. . . ."

The Court held that that statute did not contravene the constitutional right of free speech because the New Hampshire court had limited the scope of the statute to "fighting words," stating:

> "[N]o words were forbidden except such as have a direct tendency to cause acts

of violence by the person to whom, individually, the remark is addressed.

\* \* \* \* \* \*

Derisive and annoying words can be taken as coming within the purview of the statute . . . only when they have this characteristic of plainly tending to excite the addressee to a breach of the peace. . . .

\* \* \* \* \* \*

The statute as construed does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee. . . ." 91 New Hampshire 310–313, 320–321, 18 A. 2d 754, 758, 762 (1941).

In spite of the strong interest in construing the Tulsa ordinance to preserve its validity, we are unable to accept the judicial gloss suggested by the city for two reasons. First, the plain and precise language of the provision makes it impossible to narrow its overly broad scope to the prohibition of "fighting words" without exceeding the limits of the judicial reshaping of legislative enactments by substantially rewriting the ordinance. We do not confuse the power to construe with the power to legislate.

Whatever else "fighting words" might be, it is clear that they are words "directed to the person of the hearer," Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); they are words such as "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed," Chaplinsky v. New Hampshire, supra, 315 U.S. at 573, 62 S.Ct. at 770, 86 L.Ed. at 1036, and that one who hears such words must reasonably be able to regard them as "a direct personal insult," Cohen v. California, supra, 403 U.S. at 20, 91 S.

---

7. "If any person shall make use of any profane, violent, abusive or insulting language toward or about another person, in the presence or hearing, which language, in its common acceptation, is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault, every such person shall be deemed guilty of a breach of the peace, and, upon conviction thereof, shall be punished by a fine in any sum not to exceed $100.00, or by imprisonment in the county jail not to exceed thirty days, or by both such fine and imprisonment, at the discretion of the court or jury trying the same."

Ct. at 1786, 29 L.Ed.2d at 291. The Tulsa ordinance provides that it shall be an offense to use the prohibited language when any person hearing the same is insulted or offended "regardless to whom such is directed." We are unable to strain so far as to construe those words to prohibit only language which constitutes direct personal insult and is calculated to arouse to anger the person to whom such is directed.

The second reason we must reject the construction urged upon us by the city is that we note that the state statute, 21 O.S. 1971, § 1363, to which the city has called our attention, bears a penalty of one month imprisonment and/or a fine of One Hundred ($100.00) Dollars. The ordinance in question bears a penalty three times as great. If the statute and the ordinance define and proscribe the same offense, as the city urges us to hold, the punishment assessed here is beyond the jurisdiction of the city court. To so construe the statute would compel a finding that the ordinance was in conflict with the state statute, for this Court has previously held that the rule which prohibits a city from any respect enlarging upon the requirements of a state statute means that the city may not impose a greater penalty for the same offense than imposed by the state statute. Johnson v. City of Tulsa, 97 Okl.Cr. 85, 258 P.2d 695, 702 (1953).

In light of the Supreme Court decisions in this area, we are compelled to conclude that the ordinance in question is susceptible to application to speech protected by the First and Fourteenth Amendments and is, therefore, unconstitutionally broad. Further, for the reasons listed above, we do not find the ordinance susceptible of a narrowing construction which would preserve its validity.

We are not unaware the particular vulgar epithet used by the defendant would be grossly offensive to the great majority of the citizens of the City of Tulsa. The city has legitimate interest in protecting its citizens from offensive or abusive language which may provoke violence, otherwise breach the peace, or create a public annoyance.[8] Nothing in the recent cases of the Supreme Court justifies the conclusion that grossly offensive words, uttered for the sole purpose of intentionally "inflict[ing] injury" (Chaplinsky v. New Hampshire, supra, 315 U.S. at 572, 91 S.Ct. 1780) upon those who hear is constitutionally protected expression. But great care must be taken that in protecting citizens from such injury, a legislative enactment does not also "protect" them from the expression, although in offensive terms, of ideas.

In light of the result reached, we do not have occasion to decide the question of whether the words spoken by this defendant constitute "fighting words" or come within some other specific classification which may be punished with the Constitution of the United States.

For the above reasons we are of the opinion that the judgment and sentence appealed from must be, and the same is, hereby reversed and remanded with instructions to dismiss.

BUSSEY, J., specially concurs.

BLISS, P. J., joins in special concurrence of BUSSEY, J.

BUSSEY, Judge (specially concurring):

Since we are bound by the majority opinions of the members of the Supreme Court of the United States, I must, reluctantly, concur in the results reached by my colleague, Judge Brett. I believe, however, the true construction of the First Amendment right's scope, breadth, and limitations, are best analyzed in the dissenting opinion of Justice Blackmun, concurred in by Chief Justice Burger and Justice Rehnquist in

---

8. Some guidance in this connection may be provided by the Model Penal Code § 250.2 (proposed official draft, 1962), when read in connection with the later decisions of the Supreme Court in this area.

Lewis v. City of New Orleans, *supra.* The Dissent, in its entirety, reads as follows:

"Mr. Justice Holmes aptly observed:

'All rights tend to declare themselves absolute to their logical extreme.' Hudson County Water Co. v. Mc-Carter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908).

"The extremes to which we allow ourselves to be manipulated by theory extended to the end of logic is exemplified by the Court's opinion in this case and in its blood brother of two years ago, Gooding v. Wilson, 405 U.S. 518, 92 S. Ct. 1103, 31 L.Ed.2d 408 (1972). The 'overbreadth' and 'vagueness' doctrines, as they are now being applied by the Court, quietly and steadily have worked their way into First Amendment parlance much as substantive due process did for the 'old Court' of the 20's and 30's. These doctrines are being invoked indiscriminately without regard to the nature of the speech in question, the possible effect the statute or ordinance has upon such speech, the importance of the speech in relation to the exposition of ideas, or the purported or asserted community interest in preventing that speech. And it is no happenstance that in each case the facts are relegated to footnote status, conveniently distant and in a less disturbing focus. This is the compulsion of a doctrine that reduces our function to parsing words in the context of imaginary events. The result is that we are not merely applying constitutional limitations, as was intended by the Framers, and, indeed, as the history of our constitutional adjudication indicates, but are invalidating state statutes in wholesale lots because they 'conceivably might apply to others who might utter other words.' Gooding v. Wilson, *supra,* 405 U.S., at 535, 92 S.Ct. [1103] at 1112 (dissenting opinion).

"The application of this elliptical analysis to *Gooding* and to this case is instructive. In *Gooding,* officers were attempting to restore public access to a building when they were met by physical resistance and loud, personal abuse: 'White son of a bitch, I'll kill you,' 'You son of a bitch, I'll choke you to death,' and 'You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces.' The defendant was convicted under a Georgia statute which provided that any person 'who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language tending to cause a breach of the peace . . . shall be guilty of a misdemeanor.' The Court seized upon dictionary definitions and language of Georgia court decisions from the turn of the century. It concluded that the statute swept beyond the bounds of the 'fighting words' limitation of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 82 L.Ed. 1031 (1942), despite the fact that the language of the statute virtually tracked the language used by the *Chaplinsky* Court to describe words properly subject to some regulation, and without any demonstration in reason how 'the narrow language of the Georgia statute has any significant potential for sweeping application to suppress or deter important protected speech.' 405 U.S., at 529, 92 S.Ct. [1103] at 1109 (Burger, C. J., dissenting).

"In the present case, appellant and her husband were stopped by a police officer. Appellant's and the officer's respective versions of the incident are conflicting, but the municipal judge credited the officer's testimony. That finding, of course, on this record, is binding upon us. The officer testified that while he was waiting for appellant's husband to produce his driver's license, appellant came out of their truck 'and started yelling and screaming that I had her son or did something to her son and she wanted to know where he was. I said "lady, I don't have your son and I am not talking to you. I am talking to this man and you can go sit in the truck." She said "you god damn m. f. police—I am going

to Giarrusso [the police superintendent] to see about this." I said "lady you are going to jail—you are under arrest." She said "you're not taking me to jail" and she started to get back in the cab of the truck and I caught up to her while she was getting in the cab. I attempted to take her and she started fighting and swinging her arms.' App. 8. A fight ensued and appellant was subdued with the help of another officer. Appellant was charged with resisting arrest and with wantonly reviling the police. She was convicted on both charges but appealed only the conviction of wantonly reviling the police.

"We remanded this case to the Supreme Court of Louisiana to construe the meaning of the ordinance. [footnote omitted] 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972). That court, after reviewing the applicable precedents, including *Chaplinsky* and *Gooding,* specifically construed the ordinance as 'not offensive to protected speech; it is narrowed to "fighting words" uttered to specific persons at a specific time; it is not overbroad and is therefore not unconstitutional . . . . Any reasonable man knows what it is to wantonly curse or revile . . . . *The Section definitely does not sweep within its proscriptions all forms of abusive and derogatory speech.'* 263 La. 809, 826–827, 269 So.2d 450, 456 (emphasis in original).

"Again, setting the facts to one side, this Court selectively dissects the wording of the Louisiana Supreme Court opinion, eyes the word 'opprobrious,' refers us to its treatment of 'opprobrious' in *Gooding,* observes that '49–7 plainly has a broader sweep than the constitutional definition of "fighting words" announced in *Chaplinsky,'* ante 972, and concludes that 'we find nothing in the opinion of the Louisiana Supreme Court that makes any meaningful attempt to limit or properly define—as limited by *Chaplinsky* and *Gooding*—"opprobrious"

or indeed any other term in § 49–7,' Ante 94 S.Ct. at 972. And again, the ordinance is struck down with no discussion of whether it might significantly affect protected speech, and no reasons why the State's interest in public peace and the harmonious administration of its laws should not prevail over a lone, individual claim that the statute is unconstitutional as applied to others. I cannot reconcile what the Court says with what the Louisiana Supreme Court has said. I believe my Brethren of the majority merely seek a result here, just as I was convinced they sought a result in *Gooding.*

"Mr. Justice Jackson warned of the dangers of this kind of constitutional analysis:

But I did not suppose our function was that of a council of revision. The issue before us is whether what has been done has deprived this appellant of a constitutional right. It is the law as applied that we review, not the abstract, academic questions which it might raise in some more doubtful case.' Saia v. New York, 334 U.S. 558, 571, 68 S.Ct. 1148, 1155, 92 L.Ed. 1574 (1948) (dissenting opinion).

"Overbreadth and vagueness in the field of speech, as the present case and *Gooding* indicate, have become result-oriented rubber-stamps attuned to the easy and imagined self-assurance that 'one man's vulgarity is another's lyric.' Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). The danger is apparent. Inherent in the use of these doctrines and this standard is a judicial-legislative confrontation. The more frequent our intervention, which of late has been unrestrained, the more we usurp the prerogative of democratic government. Instead of applying constitutional limitations, we do become a 'council of revision.' If the Court adheres to its present course, no state statute or city ordinance will be acceptable unless it parrots the wording of our opinions.

"This surely is not what the Framers intended and this is not our constitutional function. I would adhere to what Mr. Justice Murphy, a known champion of First Amendment freedoms, wrote for a unanimous bench in *Chaplinsky,* supra, 315 U.S., at 571–572, 62 S.Ct. [766] at 769:

> 'Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." Cantwell v. Connecticut, 310 U.S. 296, 309–310, 60 S.Ct. 900, 84 L.Ed. 1213.' (Footnotes omitted.)

"The speech uttered by Mrs. Lewis to the arresting officer 'plainly' was profane, 'plainly' it was insulting, and 'plainly' it was fighting. It therefore is within the reach of the ordinance, as narrowed by Louisiana's highest court. The ordinance, moreover, poses no significant threat to protected speech. And it reflects a legitimate community interest in the harmonious administration of its laws. Police officers in this day perhaps must be thick-skinned and prepared for abuse, but a wanton, high velocity, verbal attack often is but a step away from violence or passioned reaction, no matter how self-disciplined the individuals involved. In the interest of the arrested person who could become the victim of police overbearance, and in the interest of the officer, who must anticipate violence and who, like the rest of us, is fallibly human, legislatures have enacted laws of the kind challenged in this case to serve a legitimate social purpose and to restrict only speech that is 'of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality.' *Chaplinsky, supra,* [315 U.S.] at 572, 62 S.Ct. [766], at 769 [footnote omitted]. In such circumstances we should stay our hand and not yield to the absolutes of doctrine.

"I see no alternative to our affirmance, and I therefore dissent."

In the instant case I have no hesitation construing the words uttered by defendant to the store manager as "fighting words."

Perhaps the impact of the decisions cited by Judge Brett, and the underlying facts upon which they were based, have as yet been obscured by the scandals of Watergate, the energy crisis, and the rising rate of unemployment, but as these problems are resolved, it is my fervent hope that the news media will analyze these decisions and make known to the American public that the ultimate result of the conclusions reached by the majority of the highest Court in this land, subjects every citizen and his family to hearing the most vulgar, obscene, and abusive language and leaving them without recourse if the remarks are not specifically addressed to them.[1] It

---

1. Brown v. State, Okl.Cr., 492 P.2d 1106— modified by this Court because Brown was an indigent, but otherwise affirmed (dealing with the same crime as in the instant case); and later the United States Supreme Court in Brown v. Oklahoma, 408 U.S. 914, 92 S.Ct.

will, of course, be necessary for the City of Tulsa to specifically enact a new ordinance, complying with the decisions of the United States Supreme Court, referred to in Judge Brett's opinion.

I do not believe that it can be established that in adopting the First Amendment that it was ever contemplated that the First Amendment right should be so broadly construed to sanction the results which must, of necessity, flow from these decisions. If the unbridled exercise of this First Amendment right, limited only by the lip service which empowers the states to declare unlawful and punishable only "fighting words" addressed to a particular individual, then gutter talk, obscenities and insulting language may be uttered in all places of public resort without the exclusion of the churches, schools, state-supported institutions, the courts[2], the Halls of Congress, and the hallowed grounds dedicated to honor those gallant men who strove to establish and maintain a republic which guaranteed not only the right of freedom of speech, but the right of the public to life, liberty and the pursuit of happiness, and insuring the states the power to enact, define, and declare certain acts and omissions as criminal offenses and prescribe punishment therefor.

Surely, in weighing the First Amendment guarantees, some consideration should be given to the other provisions of the Constitution to the end that standards of public speech and conduct should not be reduced to the lowest common denominator. Perhaps the majority of the Court participating in these opinions, who have also judicially decreed ever greater and broader protections for the criminal committing violent crimes, may find some time, in the distant future, to address themselves to the creation, or discovery, of rights for the thousands of victims of crimes perpetrated against them by these same protected criminals.

BLISS, P. J., concurs with Judge BUSSEY's special concurrence.

---

2507, 33 L.Ed.2d 326, vacated the judgment and remanded the case to this Court for reconsideration in the light of Cohen v. California, *supra*, and Gooding v. Wilson, *supra*. [Dissenting opinion by Chief Justice Burger with whom Justice Blackmun and Justice Rehnquist joined].

2. Eaton v. City of Tulsa, No. A–18,107—Affirmed by Order of this Court September 20,

1973 (dealing with Direct Contempt, when in open court, defendant used the language "chicken-shit") ; and on March 25, 1974, the United States Supreme Court in Eaton v. City of Tulsa, —— U.S. ——, 94 S.Ct. 1228, 39 L.Ed. 2d 693, reversed and remanded for further proceedings. [Dissenting opinion by Justice Rehnquist, with whom Chief Justice Burger and Justice Blackmun joined].