**LOGAN CITY, Plaintiff and Respondent,**

v.

**Ralph Lowell HUBER, Defendant and Appellant.**

No. 890093–CA.

Court of Appeals of Utah.

Jan. 17, 1990.

A.W. Lauritzen, Logan City, for defendant and appellant.

Cheryl A. Russell, Logan City, for plaintiff-respondent.

Before DAVIDSON, GARFF and JACKSON, JJ.

### OPINION

JACKSON, Judge:

Ralph Lowell Huber was convicted by a jury of disorderly conduct, a misdemeanor,

---

**5.** *Duckett,* 699 P.2d at 736; *Boise Cascade Corp. v. Stephens,* 572 P.2d 1380 (Utah 1977).

**6.** *See Rotta v. Hawk,* 756 P.2d 713, 716 (Utah App.1988).

in violation of a Logan City ordinance. On appeal, he challenges the constitutionality of the ordinance on its face and as applied. We reverse.

In the early morning hours of December 11, 1988, Officers Russell Roper and Greg Monroe were on alcohol enforcement detail. They were parked off the road in their unmarked patrol car when they heard and saw a small car approaching them. The car made a wide turn at the corner and started to slide on the pea gravel in the road. The car accelerated and went past the police vehicle, at a speed estimated by the officers at 35–38 m.p.h. in a 25 m.p.h. zone, then braked to a stop at a red light on Main Street and Third North in Logan City, Utah. Officer Roper followed and pulled up behind the car at the light.

When the semaphore turned green and the small car proceeded through the intersection, Officer Roper turned on his red spotlight and followed the small car as it turned in to the parking lot of defendant Huber's business. As the officers alighted, Huber got out of his car and walked briskly up to the door of his building. Officer Monroe called to Huber and said they wanted to talk to him. In an exchange of words lasting approximately two to three minutes, Roper first asked Huber how he was, and Huber turned to face the officers, who were three to four feet away. He told the police they were trespassing on his property, took a step closer and said, "Now git," and pointed in the direction they should go. Roper then asked Huber for his driver's license. Huber refused, saying, "Fuck you, I'm not going to give it to you." The request was repeated several times and Huber continued to refuse, variously responding, "Fuck you," "This is bullshit," "You know who I am," and "You guys are harassing me, you piss me right off." During this time, Huber's voice was raised, he

was using unspecified "hand actions," and he stepped closer to Roper, talking directly in his face. After Roper again explained to Huber that they had observed him speeding, Monroe took over the conversation. Although Monroe testified that he intervened because he thought there was going to be a fight, he testified to no acts other than the use of these words in a loud voice and Huber's proximity to Roper at this point. Roper explained that, once his partner stepped in and took over the conversation with Huber, he simply backed away and returned to the patrol car to summon assistance. He then rejoined Monroe at the front of Huber's car at some point after Huber had turned over his driver's license to Monroe.

The following two- to three-minute exchange took place next between Monroe and Huber, immediately preceding Huber's arrest,[1] as captured on Monroe's tape recorder (all ellipses appear in the transcript admitted into evidence):

Huber: ... You're two blocks down the road.

Monroe: We weren't two blocks down the road.

Huber: You were clear the hell down by Taco Time.

Monroe: Do you want to know where we really were? When you came around the corner, when you came around the corner awfully fast, right at the road here, we were parked just off the road. But we do need to see your driver's license.

Huber: ... This is my property and you're on it without my permission, and that's it that's what it boils down to. If it.... I'm tired of being harrassed.

Monroe: We need to see your registration too please.[2]

Huber: Bullshit! Now look you're on my property this is my building, I ha-

**1.** Monroe estimated the total elapsed time from the point at which the officers pulled in behind Huber's car in the business parking lot and the point at which he was arrested at approximately five to six minutes.

**2.** At trial, Monroe clarified that Huber had turned over his driver's license at this point, even though the officer's next line in the recorded conversation makes it seem that Huber had not yet done so.

ven't done anything wrong, I want to be left alone. I'm tired of this harrassment, because I come out of my bar and you guys start harrassing, and I don't want it.

Monroe: We need to see your driver's license, and the registration.

Huber: The registration is current it's on the back, you're going to run it through the radio, you can find out just as quick as I can.

Monroe: Look, Mr. Huber, we are trying to be decent here.

Huber: No it's because, what time is it, because you have nothing else to do. And that's it.

Monroe: In just about 2 seconds, we're not going to be decent okay. We need to see the registration.

Huber: Fine, fine, fine.[3] Get your lights out. . . .

Monroe: We'll be with you in just a second.[4]

Huber: This is a bunch of crap, you know what the car it [sic] it's mine, it's always here. Get your fuckin' light out of my car, goddamnit.[5] You guys piss me right off.

Monroe: Here's the deal Mr. Huber, you are under arrest for disorderly conduct. We are going to jail. Put your hands behind your back. Turn around and put your hands behind your back.

4. According to Roper, after Monroe said this to Huber the two officers left him and walked around to the back of Huber's car and "made a decision that the only way we could resolve this situation would be in Mr. Huber's arrest."

5. Monroe testified that this last vulgarity, which came as his partner scanned the interior of Huber's car with a high-powered flashlight, "was the straw that broke the camel's back."

6. The jury acquitted Huber on the speeding charge.

After he was taken to the police station and booked, Huber posted a cash bond and walked home. In a two-count information, Huber was charged with speeding[6] and with violating a municipal ordinance that renders a person guilty of disorderly conduct if,

> [i]ntending to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof:
>
> . . . .
>
> (D) He engages in abusive or obscene language or makes obscene gestures in a public place[.]

Logan City, Utah, Ordinance 12–8–9(2)(D) (Feb. 19, 1987).[7]

It is apparent that the challenged subsection of the Logan City ordinance criminalizes speech, i.e., obscene or abusive language spoken with the requisite intent. The constitutional guarantees of freedom of speech do not permit the government to punish the use of words or language outside of "narrowly limited classes of speech." *Gooding v. Wilson*, 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1972); *see N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). Those limited classes of unprotected speech, enumerated in *State v. Huffman*, 228 Kan. 186, 612 P.2d 630, 634 (1980) and cases cited therein,

7. The same language appears in the state law prohibiting disorderly conduct, Utah Code Ann. § 76–9–102(1)(b)(iv) (1978). Neither enactment has been construed by an appellate court of this state.

We note that Huber was not charged with violating other subsections of the ordinance, such as 12–8–9(2)(A), under which a person with the requisite intent is guilty of disorderly conduct if he "engages in fighting or in violent, tumultuous, or threatening behavior." We, therefore, address ourselves only to the subsection of the ordinance under which he was charged.

include the obscene, the libelous,[8] fighting words, and certain language that incites.

The class of unprotected speech relevant in the instant case comprises "fighting words,"[9] which the United States Supreme Court has, since its decision in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), consistently defined as words that by their very utterance inflict injury or tend to incite an immediate breach of the peace by the person to whom they are directly addressed. *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2509, 96 L.Ed.2d 398 (1987); *Lewis v. City of New Orleans,* 415 U.S. 130, 133, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1974); *Gooding,* 405 U.S. at 525, 92 S.Ct. at 1107. Even if a statute or ordinance aims at penalizing an unprotected class of speech, it "must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding,* 405 U.S. at 522, 92 S.Ct. at 1106.

In this appeal, Huber contends, *inter alia,* that Logan City Ordinance 12–8–9(2)(D) is overbroad and vague and, therefore, facially invalid as violative of the first amendment to the United States Constitution. An overbroad enactment is one "which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or the press." *Waters v. McGuriman,* 656 F.Supp. 923, 925 (E.D.Pa.1987) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1940)).

Faced with overbreadth and vagueness attacks on a statute or ordinance, our first task is to determine whether the enactment makes unlawful a substantial amount of constitutionally protected conduct. *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *see New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (only substantially overbroad statute may be invalidated on its face); *Provo City Corp. v. Willden,* 768 P.2d 455, 458 (Utah 1989).[10] If it does not, then the overbreadth challenge must fail and we should then examine the facial vagueness challenge. *Hoffman Estates,* 455 U.S. at 494, 102 S.Ct. at 1191. If it does, it may be held facially invalid even if it also has legitimate application. *City of Houston,* 107 S.Ct. at 2508.

■ We agree with appellant that Logan City Ordinance 12–8–9(2)(D), on its face, is unconstitutionally overbroad. The ordinance proscribes obscene or abusive language spoken with intent "to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof." In *Gooding,* 405 U.S. at 519, 92 S.Ct. at 1104, an ordinance punishing "opprobrious words or abusive language tending to cause a breach of the peace" was held facially overbroad. As the court pointed out, the ordinary dictionary definition of "abusive" gives it far greater reach than "fighting words." According to Webster's Third International Dictionary 8 (1986), a person is "abusive" if he or she employs "harsh insulting language." However, much of the speech that can be categorized as harsh

---

**8.** *See Cox v. Hatch,* 761 P.2d 556 (Utah 1988).

**9.** Respondent does not seriously contend that Huber's use of the word "fuckin'" as an adjective or the epithet "fuck you" is unprotected by the first amendment because obscene. In the context of determining what obscene expression is not protected by the federal Constitution, the United States Supreme Court has consistently concluded that this term is not obscene. For example, in *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), the defendant was immediately arrested for disorderly conduct by a sheriff who heard him yell "We'll take the fuckin' street later" at a public demonstra-

tion. The Court held that any contention that this speech was obscene and, therefore, punishable "would not be tenable." *Id.* at 107, 94 S.Ct. at 328; *see Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1785–86, 29 L.Ed.2d 284 (1971) (same word printed on jacket not obscene because not, "in some significant way, erotic").

**10.** Like the court in *Willden,* 768 P.2d at 458, we assume, *arguendo,* the applicability of federal first amendment standing principles in Utah courts.

insulting language does not involve words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Lewis*, 415 U.S. at 133, 94 S.Ct. at 972 (invalidating as overbroad an ordinance making it unlawful "for any person wantonly to curse or revile or to use obscene or opprobrious language" toward or about a police officer). *See, e.g., Cavazos v. State*, 455 N.E.2d 618 (Ind.App.1983) (epithet "asshole" directed at police officer did not constitute fighting words). Furthermore, as the intent required as an element of the offense makes clear, the abusive language penalized by Ordinance 12–8–9(2)(D) is expressly not limited to harsh insulting words "which by their very utterance ... tend to incite an immediate breach of the peace," as required by *Chaplinsky* and its progeny. The ordinance, far from being narrowly drawn, applies to all harsh insulting words that recklessly create a risk of inconvenience, annoyance or alarm, not just to those that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Chaplinsky*, 315 U.S. at 573, 62 S.Ct. at 770; *see State v. Swoboda*, 658 S.W.2d 24, 25 (Mo.1983) (en banc). Indeed, the Logan City ordinance does not even require that the abusive language be directed at the person who hears it, another key characteristic of "fighting words." *Chaplinsky*, 315 U.S. at 573, 62 S.Ct. at 770; *see Hess v. Indiana*, 414 U.S. 105, 107–08, 94 S.Ct. 326, 328–29, 38 L.Ed.2d 303 (1973) (per curiam); *Cohen v. California*, 403 U.S. 15, 20–21, 91 S.Ct. 1780, 1785–86, 29 L.Ed.2d 284 (1971); *Cantwell v. Connecticut*, 310 U.S. 296, 309, 60 S.Ct. 900, 905–06, 84 L.Ed. 1213 (1940). In short, the ordinance unconstitutionally punishes as disorderly conduct a significant amount of protected verbal expression, including criticism and challenge, vulgarities and remonstrations, whether it is directed at a police officer, an ordinary citizen, or one who is not even present,

without regard for its likely impact on any actual addressee.[11] As the facts in this case graphically demonstrate, Logan City Ordinance 12–8–9(2)(D), like the overbroad ordinance struck down in *Lewis v. City of New Orleans*, 415 U.S. at 134, 94 S.Ct. at 973, confers virtually unrestrained power on police to arrest and charge persons with a violation. *See id.* at 135, 94 S.Ct. at 973 (Powell, J., concurring). This type of expansive, content-based ordinance restricting speech "tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse ... is self-evident." *Id.* at 136, 94 S.Ct. at 974 (Powell, J., concurring).

■ Respondent concedes that, as drafted, the subsection of the ordinance under which Huber was charged sweeps too broadly to satisfy the first amendment. However, it contends, the term "abusive language" in the ordinance should be narrowly construed by this court as encompassing only "fighting words," thereby avoiding facial invalidity of subsection (2)(D) of the ordinance on first amendment overbreadth grounds. *See Gooding*, 405 U.S. at 522, 92 S.Ct. at 1106; *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); *State v. Jordan*, 665 P.2d 1280, 1284 (Utah), *appeal dismissed sub nom. Fullmer v. Utah*, 464 U.S. 910, 104 S.Ct. 266, 78 L.Ed.2d 249 (1983).

The court in *Conchito v. City of Tulsa*, 521 P.2d 1384 (Okla.Crim.App.1974), which held facially overbroad a municipal ordinance punishing profane or obscene language that insulted or offended the listener, was similarly called upon to construe the language in the challenged ordinance to eliminate its application to any protected speech. The court declined to do so, recognizing that narrowing the express language used by the drafters would "exceed

---

**11.** "Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship and punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131 (1949).

the limits of the judicial reshaping of legislative enactments by substantially rewriting the ordinance." *Id.* at 1388;[12] *accord Musselman v. Commonwealth,* 705 S.W.2d 476, 477 (Ky.1986) ("[C]learly the judiciary lacks power to *add* new phrases to a statute to provide a new meaning necessary to render the statute constitutional.").

We are well aware of our responsibility to construe statutes and ordinances so as to carry out legislative intent while avoiding constitutional defects. *See In re a Criminal Investigation,* 754 P.2d 633, 640 (Utah 1988); *In re Boyer,* 636 P.2d 1085, 1088 (Utah 1981); *see also Swoboda,* 658 S.W.2d at 25. However, we will not rewrite a statute or ignore its plain language in order to reach a constitutional construction. *Willden,* 768 P.2d at 458. In light of the municipality's use of the expansive term "abusive language" and its express intent to penalize speech that merely annoys, inconveniences, or alarms persons who may not even be its targets, unrestricted by the addressee's likely response, we decline to narrow the scope of Logan City Ordinance 12–8–9(2)(D) under the guise of judicial construction. Like the court in *Conchito,* 521 P.2d at 1388, we do not confuse the power to construe with the power to legislate. *See also Musselman,* 705 S.W.2d at 477. It is for the municipality, not for this court, to fashion a narrowly drawn ordinance that criminalizes unprotected speech as deemed necessary by city officials.

Because Logan City Ordinance 12–8–9(2)(D) is susceptible of application to substantial amounts of speech which, though perhaps vulgar or insulting, are nonetheless protected, it is constitutionally overbroad and facially invalid.[13] The subsection may not, therefore, be enforced against Huber or anyone else. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503–04, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394 (1985).

The conviction is reversed.

DAVIDSON and GARFF, JJ., concur.

---

**12.** In contrast, the Oklahoma court recently declined to hold facially overbroad an ordinance expressly punishing "abusive or violent language" that "disturb[s] the public peace or quietude." The court concluded that the latter phrase in the ordinance, as previously construed to require conduct that incites violence or tends to provoke others to break the peace, was within the boundaries set by *Chaplinsky* and later "fighting words" cases. *Harrington v. City of Tulsa,* 763 P.2d 700, 701 (Okla.Crim.App. 1988).

**13.** In light of our disposition of this case on the first amendment overbreadth issue, we need not reach the other important issues presented by Huber, including his claims that the ordinance is unconstitutionally vague and that, even if narrowly construed as punishing only "fighting words," the ordinance cannot constitutionally be applied to his speech.