335 So.2d 538 (1976)
Rosetta MALONE et al., Plaintiffs-Appellants,
v.
Troy J. FIELDS et al., Defendants-Appellees.
No. 12938.
Court of Appeal of Louisiana, Second Circuit.
July 7, 1976.
*539 Baker, Culpepper & Brunson by Joseph A. Cusimano, Jr., Farmerville, for plaintiffs-appellants.
Durrett, Hardin, Hunter, Dameron & Fritchie, by Emile C. Rolfs, III, Baton Rouge, Hargrove, Guyton, Ramey & Barlow by Michael R. Mangham, Shreveport, for defendants-appellees.
Before BOLIN, MARVIN and JONES, JJ.
MARVIN, Judge.
Plaintiffs appeal from the rejection of their respective demands for personal injury, humiliation and embarrassment against a deputy sheriff, his employer, the Sheriff of Union Parish, and their liability insurer. This suit arose out of an incident between plaintiffs and a Sheriff's deputy in front of a tavern. The deputy admittedly physically attacked the several plaintiffs but claims reasonableness in the force used and justification because plaintiffs were interfering with his investigation into a shooting at the tavern, which did not involve plaintiffs. We reverse the lower court and render judgment for the several plaintiffs.
The tavern, called "Ne-Ne's," is situated about 100 feet from a public road in or near Bernice, Louisiana. Deputy Fields was directed to the tavern on a Saturday afternoon to investigate a shooting. He arrived in uniform in his Sheriff's car about the same time as the Bernice City Marshal. There were several people outside the tavern, including plaintiffs. The City Marshal estimated the number at "probably fifteen" and said they were "spread out" in smaller groups.
Plaintiffs are (1) Rosetta Malone, the mother of plaintiffs (2) Willie Ray Jones and (3) Mrs. Peggie Dunn. Mrs. Dunn is the wife of plaintiff (4) Tommy Lee Dunn. Except for Tommy Lee Dunn, each of plaintiffs had drunk one or two beers prior to the incident, but were not found to be intoxicated.
The record establishes the following circumstances: When Deputy Fields began to walk the 100 feet towards the tavern he asked Rosetta Malone where the trouble was. She told him it had happened inside the tavern and the deputy proceeded towards *540 the tavern. Peggie Dunn was sitting on the hood or fender of a parked car some twenty feet away from the building and not in the path of the deputy towards the doorway of the tavern. Peggie Dunn said to Deputy Fields as he walked by her and got near the door of the tavern, "By the time the cops get here we all be dead." Fields then turned and walked to Peggie Dunn and told her to "shut up" and slapped her. She told him he could not tell her to shut up and he slapped her again. She returned the slap. At one point, Fields told her to shut up and go home. Peggie's husband, Tommy Lee Dunn, was standing on the porch of his home next to the tavern and saw Deputy Fields slap his wife. Tommy Lee Dunn then came up to Fields and inquired why Fields was slapping his wife. Fields then began to slap Tommy Lee Dunn. About the fourth time Fields slapped him, Dunn grabbed Fields' arm to keep him from slapping again.
From some distance away, Willie Ray Jones saw Fields hit Dunn and came to where Fields and Dunn were. Willie Ray admittedly used profanity (but did not curse Fields) in asking Fields what was going on and why he was hitting people. Fields then hit or slapped Willie Ray Jones twice, the second time knocking him to the ground and dazing him.
Rosetta Malone then approached Deputy Fields demanding to know why he was slapping her "children." Fields attempted to ignore Mrs. Malone, telling her to shut up, but she persisted in asking such questions. Fields then sprayed her in the face with Mace, a chemical irritant, and went into the tavern. There he learned that those involved in the earlier shooting had been picked up by another lawman before he arrived. After Fields came out of the tavern and started towards his car, Mrs. Malone followed him with the same persistent questions as to why he had slapped her children. Fields again sprayed Mrs. Malone with Mace when she was about 10 feet away.
Testimony concerning the incident was elicited from plaintiffs, from Deputy Fields and Marshal Wright, and from two witnesses, George Sheldon and Michael Lowe. Sheldon and Lowe corroborated plaintiffs' versions of the incident. The record clearly shows Deputy Fields hit or slapped Mrs. Dunn and her husband before he went into the tavern. When Fields hit Tommy Lee Dunn for the fourth time, Dunn grabbed Fields' arm to keep him from hitting him again. At that time the Marshal manipulated a shotgun to cock it and place a shell in the chamber. Wright had obtained the shotgun from his police car parked near the Sheriff's car. When Tommy Lee Dunn heard the noise of the shotgun being manipulated he released his grip on Fields' arm.
The record is not as clear whether it was before or after Fields went into the tavern that he struck Willie Ray Jones and sprayed Mrs. Malone the first time with Mace. Deputy Fields said he was within ten or twenty feet from the tavern door when Peggie Dunn "started running off at the mouth." He acknowledged that she was not keeping him from going to the building but that "every time I try to . . . walk away from her, she'd start back running off at the mouth. . ." Fields did not remember in what order he hit Willie Ray Jones and Tommy Lee Dunn after he hit Peggie Dunn. He did not remember how many times he hit Peggie Dunn, Tommy Lee Dunn or Willie Ray Jones.
Deputy Fields testified about his actions after he had hit these people.
"I think I stood around there for a few minutes. They were all upset and hollering and I kept telling them to go home and they just keep standing around and then Rosetta [Malone] kept running off at the mouth."
He said Rosetta Malone was not between him and the doorway of the tavern and that he sprayed her because "I couldn't get her to go on and get out of my way." He said that none of the people were blocking his way or holding him in any way.
*541 The second spraying incident he described in these words:
"She followed me all the way back to the car [from the tavern] ["I'd say 10 feet behind me"] . . . we [Fields and the Marshal] was trying to stand up there and talk about what had happened and she came up there again and I sprayed her again . . . I think she kept saying the same thing over and over that something was going to be done."[1]
Fields acknowledged no one threatened him but that he "thought" they were because they "gathered" around him.
Marshal Wright said Peggie Dunn was sitting on a car and was not blocking Fields' passage to the building and that her remarks about the late arrival of the police were directed at him and the other people as well as at Fields, and that Fields hit her first without her threatening him when no one else was nearby ("it was a one sided fight . . . at that time I was starting back to the car"). Wright got the shotgun from his car and turned around in time to observe Willie Ray Jones on the ground.
Wright "assumed" that Fields struck the plaintiff men in "self-protection," but said that he did not see anyone "throwing blows" beside Fields. He did say Willie Ray Jones "reached out" for Fields just before Jones went to the ground [from Fields' blow]. Wright admitted that he and Fields could have walked past Peggie Dunn and into the tavern after Peggie Dunn's initial remark. Deputy Fields and Marshal Wright testified that Peggie Dunn used profane language (without specifying what words) in her initial statement toward the officers. Without resolving this issue of fact, we shall assume her language did contain some curse words. Wright quoted Peggie Dunn, however, as saying ". . . by the time the police or officers arrived, a person could get killed."
In Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), a city ordinance made it unlawful to curse or revile or to use obscene or opprobrious language toward a police officer while in the performance of his duties. There a mother was in a pickup truck following a police car which was taking her son to the station after his arrest. A second police car stopped the truck and the mother and the policemen from this car confronted each other. The policeman arrested her for violating the above ordinance when she "started yelling and screaming (about her son) and . . . wanted to know where he was . . . (She called the policeman) "you god damn m.f. policeI am going to [the Superintendent of Police] about this."'" Material in parentheses supplied. See footnote one, at 131, 94 S.Ct. 971.
The Louisiana Supreme Court held the quoted language to be in the category of "fighting words" and therefore outside the protection of permissive free speech afforded by the First Amendment. The Supreme Court of the United States held the ordinance in question to be "constitutionally overbroad" in that it could be applied to protected speech and reversed the conviction. In reaching this result, the U.S. Supreme Court, however, did not pass on whether the quoted language was properly categorized by the Louisiana Supreme Court because it noted that it was "immaterial whether the words appellant used might be punishable under a properly limited statute or ordinance." See at 133, 94 S.Ct. 972.
In a concurring opinion, one Justice reached the issue of the character of the quoted language in these words:
"It is unlikely, for example, that the words said to have been used here would have precipitated a physical confrontation between the middle-aged woman who spoke them and the police officer in whose presence they were uttered. The words may well have conveyed anger and frustration without provoking a violent *542 reaction from the officer. Moreover, as noted in my previous concurrence, a properly trained officer may reasonably be expected to `exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to `fighting words.' [Gooding v. Wilson], 408 U.S. 913, 92 S.Ct. 2499, [33 L.Ed.2d 321]. See Model Penal Code § 250.1, Comment 4 (Tent. Draft No. 13, 1961)." At 130, 135, 94 S.Ct. 970, 973.
Indeed the majority opinion of the U.S. Supreme Court noted in a footnote that trained police officers were held by some authorities to a "higher degree of restraint than the average citizen" in avoiding physical retaliation even to "fighting words." See footnote two, at 132, 94 S.Ct. 972.
In his dissent to the holding of the Louisiana Supreme Court, concurred in by one other Justice, Mr. Justice Tate stated:
"The ruling in Gooding v. Wilson is decisive of this case, as the United States Supreme Court indicated by ordering us to consider the present conviction in the light of that decision.
"The language there used by the defendant to a Georgia police officer was `White  of a b I'll kill you' and `You s of a b I'll choke you to death'. See [at 913], 92 S.Ct. 1112. In the present case, the mother called the police officer a `G___d___ m___f___' police. The fact that the latter words used are shocking to the sensibilities of people of our generation does not by itself justify classifying such critical language as not protected by the constitution. See Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).
"Whatever our personal views are as to what sort of language should or should not be punishable, this court is bound by our state and federal constitutions to enforce constitutional protection of individuals and their speech as interpreted by authoritative decisions of the nation's high court. . .
"The police, our front line soldiers in the battle against crime, deserve the respect and support of our officials and citizens. Nevertheless, ever since this nation fought for and obtained its freedom, it has not been a crime to curse or use opprobrious language about the public officers of our democratic republic . . ." 263 La. 809, 269 So.2d 450, 459.
We comment upon these cases not to show our approval of unwarranted and harsh criticism of police officers in the course of their duties, but to show the observations of our highest courts with respect to the issue of freedom of speech versus fighting words toward a policeman. See annotation, 39 L.Ed.2d 925.
In the instant case, the incident occurred in the parking lot or area on and adjacent to the public street where patrons of the tavern parked motor vehicles. R.S. 14:108 sets forth the crime of resisting an officer.[2] La.C.Cr.P. Art. 220, states that citizens shall "submit peaceably" to a lawful arrest. This Article reads:
"A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." *543 The article further provides that the person making a lawful arrest may use "reasonable force" to overcome "any resistance." See Logan v. Swift, 327 So.2d 168 (La.App.2d Cir. 1976). If a person intentionally jostles or unnecessarily crowds a policeman the person may be arrested. If a person intentionally opposes, resists or obstructs a police officer, the person may be arrested. The policeman may then use reasonable force to effect the arrest or overcome any resistance.
We do not view the language and the actions of Mrs. Peggie Dunn as constituting either the crime of resisting an officer (R.S. 14:108) or the crime of criminal mischief (R.S. 14:59). Even assuming arguendo, however, that her language and her actions did constitute one or the other of these offenses, Deputy Fields did not arrest her, during or after the incident. Instead of hitting her, Deputy Fields' course, and the course the law contemplates that a police officer shall take, should have been to arrest her for either one or more offenses such as are cited from the Criminal Code. If she did not submit peaceably to the arrest, Deputy Fields would have been authorized under Art. 220, La.C.Cr.P., to use reasonable force in overcoming resistance or threatened resistance. He would have been authorized to summon or call upon as many persons as he considered necessary to aid him in making the arrest under Art. 219, La.C.Cr.P.
Art. 18 of the Criminal Code sets forth seven instances when the defense of justification can be claimed.[3] It should be noted that the justification is a defense to the prosecution for any crime based on the conduct in question. For defenses as to civil liability, see Comment, "Tort Liability of Law Enforcement Officer: State Remedies," 29 La.L.R. 130.
We do not find here that Deputy Fields' conduct toward plaintiffs was justified under any provision of Art. 18 of the Criminal Code and we do not find that he was making a lawful [or for that matter, unlawful] arrest under Art. 220, La.C.Cr.P. In the absence of facts warranting application of these articles, a law enforcement officer may not physically attack a private citizen for making comments about the officer which are not in themselves threatening to the officer's safety or to his authority as a law enforcement officer in the course of his duty. See R.S. 14:329.1, et seq., quoted infra.
The trial court concluded that Fields had two "imperative" objectives upon reaching the tavern, (1) to find out who was involved, and (2) to disperse the crowd.[4]
The lower court concluded that the several plaintiffs acted in a manner calculated to interfere with the accomplishing of these objectives. The lower court also concluded that Peggie Dunn's words were inflammatory and could have "ignited the emotions of what appeared to be an angry group of *544 people . . . [and that] . . . it was necessary for the deputy to show other members of the crowd that he would use the degree of force required to compel compliance with his orders." We do not agree with these conclusions. They are also not supported by the testimony of Deputy Fields or the City Marshal. Again, assuming Mrs. Dunn's words were of the character assigned by the lower court, she could have been arrested for inciting to riot and the officers could have given the crowd a command to disperse, the violation of which in itself is a crime.[5]
Additionally, it should be noted that when the City Marshal exhibited and manipulated his shotgun, the "crowd" as it were, did disperse. This action by the City Marshal indicates that a reasonable demonstration of a weapon by a law enforcement officer, as opposed to actual violence, is all that is necessary in some instances for an officer to gain the attention of a crowd of people and have his orders obeyed. We do not view this record as establishing in any way a clear and present danger to either officer, especially considering the City Marshal's testimony as to the number of people present and the fact that they were "spread out."
The trial court thought Mrs. Malone's "repeated badgering . . . presented the deputy with the alternative of either stopping his investigation . . . to soothe the ruffled feelings . . . or using reasonable force to prevent her further obstruction of the investigation." Again, we disagree. Mrs. Malone was not threatening the deputy by her words or her actions. The verbal assault or inquiry was harassing but not threatening. If Mrs. Malone was obstructing in the manner contemplated by R.S. 14:108, Deputy Fields' course was to arrest her. It would have been her duty to submit peaceably to the arrest and his privilege then if she did not, to use reasonable force in effecting the arrest or overcoming her resistance or threatened resistance. The law affords means to the law enforcement officer to control whatever situation he is in without his initially resorting to a physical attack upon those who are in his vicinity of operations. Plaintiffs are entitled to recover damages.

QUANTUM
None of these plaintiffs were seriously injured. Mrs. Dunn testified she was more embarrassed than hurt. With the possible exception of Mrs. Malone, none of the plaintiffs sought medical attention. Mrs. Malone saw an eye specialist (optometrist or ophthalmologist) in March after the incident in October. She testified that her eyes burned for this period of time. Whether Mrs. Malone's treatment in March after the spraying was causally connected to the incident was a question solely for the specialist as an expert witness. The specialist did not testify. Mrs. Malone testified that the second spraying of Mace did not hit her in the eyes.
Notwithstanding the absence of physical injury, each plaintiff sustained some degree of embarrassment and humiliation because of Fields' respective attack. Awards in these type cases range from *545 $25.00[6] to more than $15,000.00.[7] We feel a fair and just award to each plaintiff would be $150.00. Mrs. Malone should be entitled to a slightly higher award because she sustained some temporarily continuing eye irritation and we award her an additional $100.00.
For reasons assigned, judgment rejecting plaintiffs' demands is reversed and accordingly:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in solido and against defendants, Troy J. Fields, Eugene Patterson, Sheriff of Union Parish, Louisiana, and Interstate Fire and Casualty Company, in favor of
(A) Plaintiff, Mrs. Rosetta Malone for $250.00;
(B) Plaintiff, Mrs. Peggie Dunn for $150.00;
(C) Plaintiff, Tommy Lee Dunn for $150.00; and
(D) Plaintiff, Willie Ray Jones for $150.00,
with legal interest from judicial demand.
IT IS FURTHER ORDERED that defendants pay all costs of these proceedings in the trial court and on appeal.
REVERSED AND RENDERED.
NOTES
[1] As we appreciate the testimony, the "something" that was going to be done did not concern any threat of violence towards Fields but concerned only Fields' right to whip her children and her right to know why.
[2] In part, it reads: "Resisting an officer is the intentional opposition or resistance to, or obstruction of, an individual acting in his official capacity and authorized by law to make a lawful arrest or seizure of property, or to serve any lawful process or court order, when the offender knows or has reason to know that the person arresting, seizing property, or serving process is acting in his official capacity.

"The phrase `obstruction of' as used herein shall, in addition to its common meaning, signification and connotation mean: * * *
"(d) Congregates with others on a public street and refuses to move on when ordered by the officer.
"Whoever commits the crime of resisting an officer shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both."
See also R.S. 14:59(8) (Criminal Mischief) to same effect. It is also criminal mischief to jostle against or unnecessarily crowd a person in any place. R.S. 14:59(9).
[3] ". . . (1) When the offender's conduct is an apparently authorized and reasonable fulfillment of any duties of public office; or

"(2) When the offender's conduct is a reasonable accomplishment of any arrest which is lawful under the Code of Criminal Procedure; or
"(3) When for any reason the offender's conduct is authorized by law; or
"(4) When the offender's conduct is reasonable disciopline of minors by their parents, tutors or teachers; or
"(5) When the crime consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility; or
"(6) When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the affender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed; or
"(7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22."
[4] Our recitation of facts is essentially the same as the lower court's recitation, except for the number of people outside the tavern. The lower court used the figure of 30-35 people and labeled this as a "crowd." This figure came from a very rough estimate by the witness Shelton. At other times in his testimony this witness estimated a much lesser number and said he did not know how many people were there. We prefer to adopt the estimate and characterizations of the City Marshal.
[5] R.S. 14:329.1: "A riot is a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property."

R.S. 14:329.2: "Inciting to riot is the endeavor by any person to incite or procure any other person to create or participate in a riot."
R.S. 14:329.3: "Any law enforcement or peace officer or public official responsible for keeping the peace may issue a command to disperse under the authority of R.S. 14:329.1-14:329.8 if he reasonably believes that riot is occurring or about to occur. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage."
"Whoever wilfully fails to comply with a lawful command to disperse shall be punished in accordance with the provisions of R.S. 14:329.7."
[6] See: Daigle v. Gilmore, 116 So.2d 860 (La. App. 1st Cir. 1959) where a game warden administered a slap.
[7] See: Taylor v. City of Baton Rouge, 233 So.2d 325 (La.App. 1st Cir. 1970) where a policeman administered a much more sustained beating with severe injuries.

See also: Jacobs v. City of New Orleans, 484 F.2d 24 (5th Cir. 1973) where $500.00 was awarded because of injuries administered at the hand of a policeman. Medical expenses there were $173.00.