*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LANCE CRAIG EICHLER,

Defendant-Appellant.

FOR PUBLICATION
September 29, 2025
2:58 PM

No. 371360
Mason Circuit Court
LC No. 2023-004339-FH

Before: CAMERON, P.J., and MURRAY and KOROBKIN, JJ.

KOROBKIN, J.

Defendant, Lance Craig Eichler, was convicted after a bench trial of aggravated stalking, MCL 750.411i, and using a computer to commit a crime, MCL 752.797(3)(d). Because we agree with defendant that the evidence in this case was insufficient to support his convictions, we reverse.

## I. BACKGROUND AND FACTS

While incarcerated for a previous offense, defendant was assigned to probation agent Megan Myers. Upon defendant's release on April 14, 2023, he reported to Myers's office in person to initiate postrelease supervision. Myers explained that she preferred that her probationers contact her work-issued cell phone, as opposed to e-mail, to report any required information. She also reviewed with defendant the requirements of his probation, including information that he was required to report within 24 hours: any changes to his contact information, physical address, or employment status; any contact with law enforcement; and if he received a personal protection order (PPO) against him.[1]

Over the course of nearly two weeks, defendant contacted Myers by text about a variety of topics related to his probation, including employment, housing, requests to lift probationary

---

[1] Defendant's actual terms of probation were not made a part of the record.

restrictions on being near firearms at work, purportedly incorrect probation-related monitoring fees, an individual posting about defendant's probation status on social media, an altercation with his housing caseworker, and to report that he had observed suspected criminal activity. Defendant's texts tended to be rambling and unfocused, and some were screenshots of other text-message exchanges or documents that defendant wanted Myers to see. Myers testified that she received a total of 152 messages from defendant, and that defendant contacted her at "[a]ll hours of the day."

Myers testified that on April 22, 2023, she "started feeling harassed" when the volume of defendant's text messages substantially increased; she received 29 text messages from him that day, and 15 the next day. On April 24, 2023, Myers e-mailed defendant, informing him that she was overwhelmed by how often he contacted her and reminding him of the types of information that he was required to report to her within 24 hours. She advised him to write down any other questions so that they could address them at their in-person meetings and that his questions and concerns "did not require . . . constant communication throughout the day and night." Later that day, she texted him the following:

Please see my email sent. The texting and emailing needs to stop immediately, with exception laid out in the email.

Thank you.

Defendant nonetheless continued to send her a large number of texts regarding probation-related matters. On April 25, 2023, Myers texted defendant:

You need to stop texting me. After detailing what is relevant to report to me and what isn't[,] I should not have woken up to 10 text[] messages from you.

According to Myers, defendant acknowledged that he needed to stop texting her but did not do so. The evidence reflects that defendant continued to send long and rambling text messages to Myers regarding situations involving his employment, housing, probation supervision fees, suspected criminal activity, and the terms of his probation.

On April 26, 2023, Myers met with her supervisor, Matthew Chitwood, to discuss how to handle the situation. According to Chitwood's testimony, Myers was "visually anxious, frustrated, unsure of how to proceed with the case and wanted my opinion on how and what actions she should take next." Chitwood decided to remove defendant from Myers's supervision caseload and reassign him to another probation agent. Chitwood also directed Myers to block defendant's phone number, which she did. Chitwood then arranged to meet with defendant later that day to inform him that he was being assigned to a different agent. During the meeting, Chitwood contacted law enforcement and defendant was arrested. After April 26, Myers did not receive any more text messages or e-mails from defendant.

Defendant was charged with aggravated stalking and using a computer to commit a crime. At trial, the prosecution established that defendant had previously been convicted of stalking, making him eligible to be convicted of aggravated stalking. Myers testified that, in this case, defendant's communications with her made her feel "very harassed and mentally and emotional distress[ed], very high anxiety, overwhelmed, [and] unable to keep up." She also testified that she

sought treatment for the distress, but she also acknowledged that she had begun counseling for personal issues several years before her interactions with defendant and that she was not in counseling solely for the alleged harassment from this case. Myers additionally acknowledged that the only unwanted contact she had with defendant was on her work-issued cell phone; defendant never went to her house, never appeared at her workplace without an appointment, never physically followed or approached her, never contacted her personal cell phone, and never attempted to contact her through social media.

Defendant testified that he believed that his texts were all related to his probation and that spotty cell service at night caused his messages to be received at odd hours. He also testified that he used the voice-to-text function on his cell phone to send text messages, which could end up being "longwinded," and that those messages split into multiple text bubbles.

Following a bench trial, the trial court issued its verdict from the bench and found defendant guilty of the charged offenses. Defendant now appeals.

## II. STANDARDS OF REVIEW

Challenges to the sufficiency of the evidence following a bench trial are reviewed de novo. *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "The sufficient evidence requirement is a part of every criminal defendant's due process rights." *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748, amended on other grounds 441 Mich 1201 (1992). "In evaluating defendant's claim regarding the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Xun Wang*, 505 Mich at 250. "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of the elements." *ARM v KJL*, 342 Mich App 283, 295; 995 NW2d 361 (2022).

We also review "underlying issues of statutory interpretation" de novo. *People v Smith-Anthony*, 296 Mich App 413, 416; 821 NW2d 172 (2012). Our goal in interpreting a statute is to give effect to the intent of the Legislature. *People v Stone*, 463 Mich 558, 562; 621 NW2d 702 (2001). When a statutory term is not defined, we give the term its common and ordinary meaning. *People v McIntire*, 461 Mich 147, 153; 599 NW2d 102 (1999); MCL 8.3a. "We must apply the plain, unambiguous language of a statute as written and may only engage interpretative tools when the statutory language is equally susceptible to more than one meaning." *Smith-Anthony*, 296 Mich App at 416.

## III. ANALYSIS

## A. AGGRAVATED STALKING

Defendant contends that there was insufficient evidence to support his conviction for aggravated stalking. We agree.

Our analysis begins with the plain text of the relevant statute. MCL 750.411i(1) provides, in pertinent part:

(a) "Course of conduct" means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose.

* * *

(c) "Emotional distress" means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling.

(d) "Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

(e) "Stalking" means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(f) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

* * *

(vi) Sending mail or electronic communications to that individual.

And MCL 750.411i(2) provides, in pertinent part:

An individual who engages in stalking is guilty of aggravated stalking if the violation involves any of the following circumstances:

* * *

(d) The individual has been previously convicted of a violation of this section or [MCL 750.411h].

In other words, the offense of aggravated stalking consists of stalking and "the presence of an aggravating circumstance," *People v Threatt*, 254 Mich App 504, 505; 657 NW2d 819 (2002), here, a previous stalking conviction.

At the conclusion of defendant's bench trial, the trial court found that once Myers texted defendant on April 25, 2023 with the message "[y]ou need to stop texting me," defendant's subsequent texts were unconsented contacts. The trial court further found that the texts were not threatening, intimidating, or terrorizing, but that they were harassing because they continued after defendant was asked to stop and did not serve a legitimate purpose because they repeated information that had been conveyed or were outside the parameters of what Myers had indicated was appropriate. The trial court credited Myers's testimony that the contacts caused her emotional distress. And the trial court stated that a reasonable person would have found defendant's conduct to be harassing because defendant continued to text Myers after she told him to stop and defendant received no more responses to his texts.

On appeal, defendant argues that the evidence was insufficient to sustain his conviction because his acts were not willful, his contact with Myers was not unconsented, his text messages were constitutionally protected or served a legitimate purpose, and his conduct would not cause a reasonable probation officer to suffer emotional distress. We need only consider the last argument because we find that it has merit and is dispositive of this appeal.

In examining defendant's argument, there are three layered levels in the statute that must be considered. Under the definition of "stalking," the conduct must involve "repeated or continuing harassment" and must be such "that would cause a reasonable person to feel . . . harassed . . . ." MCL 750.411i(1)(e). "Harassment," in turn, is defined to require conduct "that would cause a reasonable individual to suffer emotional distress." MCL 750.411i(1)(d).[2] And "emotional distress" is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." MCL 750.411i(1)(c). In essence, then, the harassment required for a stalking conviction hinges, in part, on whether the conduct in question would cause a reasonable person to suffer emotional distress as that term is defined in the statute.[3]

Turning now to that statutory definition, MCL 750.411i(1)(c) states that " '[e]motional distress' means *significant* mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." (Emphasis added.) In *Martin v Smith*, unpublished opinion of the Court of Appeals, issued December 10, 2020 (Docket No. 354128), p 10, this Court addressed the statutory definition as follows:

---

[2] Although subsection (e) uses the term "reasonable person" and subsection (d) uses the term "reasonable individual," "[t]he terms 'reasonable individual' and 'reasonable person' are essentially synonymous and have been treated by this Court as interchangeable." *People v Spaulding*, 332 Mich App 638, 651 n 3; 957 NW2d 843 (2020).

[3] As MCL 750.411i(1)(d) makes clear, in addition to proving that the conduct in question would cause a reasonable individual to suffer emotional distress, the prosecution must separately prove that it "actually causes the victim to suffer emotional distress." Here, the trial court found that defendant's conduct did cause Myers emotional distress, and defendant does not challenge the sufficiency of that evidence on appeal.

-5-

Because the statute does not define "significant mental suffering or distress," it is proper to consult dictionary definitions. "Significant" is defined as "of a noticeably or measurably large amount," and "suffering" is defined as "pain." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, "significant mental suffering" means as "a noticeably or measurably large amount" of mental "pain." "Distress" is defined as "subject to great strain or difficulties[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed).

Although *Martin* is unpublished and therefore not binding, MCR 7.215(C)(1), we find the analysis above to be persuasive, and we adopt it. See *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020). Thus, applied here, there must be sufficient evidence of conduct by defendant that would cause a reasonable person to suffer a noticeably or measurably large amount of mental pain or, to a noticeably or measurably large extent, to be subject to great mental strain or difficulties.

Continuing with the statutory definition, the phrase "that may, but does not necessarily, require medical or other professional treatment or counseling," MCL 750.411i(1)(c), indicates that the Legislature intended to define emotional distress to mean mental suffering or distress of a certain kind or at a certain level. It is a "well-recognized rule" of statutory construction "that we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory." *People v Miller*, 498 Mich 13, 25; 869 NW2d 204 (2015) (quotation marks omitted). If the Legislature had intended that the possibility of a need for professional treatment be completely irrelevant to the definition of whether someone suffered emotional distress, it need not have included it in the statutory definition. See *id*.[4] The "does not necessarily" clause clearly means that a person can suffer emotional distress within the meaning of the statute without requiring professional treatment, while the words "that may . . . require," combined with the modifier "significant" earlier in the definition, MCL 750.411i(1)(c), denote an intent to define emotional distress as being of a kind or at a level that may require such treatment. See *Outside Legal Counsel, PLC v Dep't of Treasury*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 374178), slip op at 3 ("[U]nder the associated-words canon, a statutory term must be viewed in light of the words surrounding it and its context or setting.") (quotation marks and citations omitted). Therefore, in the present case, there must be sufficient evidence of conduct by defendant that would cause a reasonable person to experience mental suffering or distress of a kind or at a level that may, but does not necessarily, require medical or other professional treatment or counseling.

---

[4] Similarly, if the Legislature merely intended to clarify that proof of professional treatment was not a statutory requirement, it could have explicitly said so in a separate sentence. By way of illustration, Colorado's stalking statute provides: "For purposes of this paragraph . . . , a victim need not show that he or she received professional treatment or counseling to show that he or she suffered serious emotional distress." Colo Rev Stat Ann 18-3-602. By explicitly *defining* emotional distress as distress "that may, but does not necessarily, require medical or other professional treatment or counseling," MCL 750.411i(1)(c), it is likely that our Legislature intended to supply further meaning to the definition.

That brings us to the question of how to understand the concept of the "reasonable person" under MCL 750.411i. Defendant argues that Myers, as defendant's probation agent, "should be held to a higher standard." To the extent that defendant is suggesting that some standard other than that of the "reasonable person" should apply because Myers was defendant's probation agent, we must reject that argument, as we have no authority to disregard the plain language of the statute—we must apply the law as written. *People v Wolfe*, 251 Mich App 239, 242; 651 NW2d 72 (2002). However, insofar as defendant is suggesting that we must consider how defendant's conduct would affect a reasonable probation agent, we agree that Myers's occupation is relevant. "The 'reasonable person' . . . standard generally calls for consideration of the circumstances or situation." *People v Spaulding*, 332 Mich App 638, 651 n 3; 957 NW2d 843 (2020). Thus, a "reasonable individual" under MCL 750.411i is "a reasonable person similarly situated to the victim." *Id*. Myers is a probation agent who was supervising defendant, and we must determine whether there was sufficient evidence of conduct by defendant that would cause a reasonable person in Myers's position—similarly situated to her, and considering the circumstances or situation—to suffer "emotional distress" as that term is defined in MCL 750.411i(1)(c).

Turning now to the facts of the case, we conclude that there was not. Defendant's texts largely pertained to his employment, housing, a probation monitoring fee, suspected criminal activity that he witnessed, and someone posting information about him on social media. Such content, even when deemed by Myers to be irrelevant or containing information it was unnecessary for defendant to immediately report, would not cause a reasonable person in Myers's position to suffer "significant mental suffering or distress" of the kind or at a level required by MCL 750.411i(1)(c). Unlike in many stalking cases, the communications in question did not contain inappropriate or disturbing language, arise in the aftermath of domestic violence, violate a PPO, or follow a lengthy period of harassment. See, e.g., *Spaulding*, 332 Mich App at 641-643; *People v Coones*, 216 Mich App 721, 724; 550 NW2d 600 (1996); *People v White*, 212 Mich App 298, 301-303; 536 NW2d 876 (1995). We agree with the trial court that none of defendant's messages were threatening. Additionally, as previously stated, defendant's text messages were all sent to Myers's work-issued cell phone, he did not physically approach or follow her, and he did not contact her on a personal device or over social media.

Nor do we think that the sheer number, frequency, and length of defendant's messages would cause a reasonable person in Myers's position "significant mental suffering or distress" under MCL 750.411i(1)(c). Although defendant did send Myers a large number of lengthy text messages, under the circumstances we are unpersuaded that this is sufficient to sustain defendant's conviction. In determining whether an alleged harasser's statements would cause a reasonable person to suffer emotional distress within the meaning of MCL 750.411i(1)(c), a court must "consider the surrounding context in which they were made." *Berryman v Mackey*, 327 Mich App 711, 724; 935 NW2d 94 (2019) (vacating PPO because, in context, the defendant's statements would not cause a reasonable person in the plaintiff's position to suffer emotional distress). The surrounding circumstances of this case demonstrate that all of the texts defendant sent to Myers were related to her supervision of defendant and lasted only a few days, from April 22 until April 26. On April 26, Myers met with Chitwood, it was decided that Myers would block defendant's number and defendant's supervision would be transferred to another probation agent, and the contacts ended at that time.

As previously noted, Myers's occupation and relationship to defendant is also a relevant consideration in the "reasonable person" analysis. Myers was a government law enforcement agent whose job was to work directly with probationers, which inherently includes problem solving from time to time when it comes to probationers who do not follow instructions. Just as the United States Supreme Court has observed that "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words,' " *City of Houston v Hill*, 482 US 451, 462; 107 S Ct 2502; 96 L Ed 2d 398 (1987), quoting *Lewis v New Orleans*, 415 US 130, 135; 94 S Ct 970; 39 L Ed 2d 214 (1974) (Powell, J., concurring) (quotation marks omitted), we likewise would not expect a reasonable person in Myers's position—a properly trained probation agent—to experience emotional distress (as statutorily defined) solely because they received a high volume of probation-related texts on their work-issued cell phone from a probationer over a several-day time span. This is particularly so when the supervision problem can be promptly addressed by blocking the probationer's number and having the probationer reassigned to a new agent.

The prosecution argues that Myers should not be expected to have "thicker skin or greater patience than a reasonable individual simply by virtue of her occupation." As discussed above, we agree that Myers cannot be held to a higher standard than that of a reasonable individual. However, under *Spaulding*, a "reasonable individual" is "a reasonable person similarly situated to the victim," which necessarily means that we must consider Myers's chosen occupation, training, and job-related responsibilities as part of our "consideration of the circumstances or situation." *Spaulding*, 332 Mich App at 651 n 3. Consequently, the prosecution's position does not entirely account for the fact that in some occupations, particularly related to law enforcement, it is reasonably expected that trained employees will be equipped with the "thicker skin or greater patience" required to handle some challenging situations without experiencing the "significant mental suffering or distress" that a lay person might otherwise experience when confronted with a similar situation. This is not to say that a reasonable person in Myers's situation would not have found defendant's behavior to be annoying, challenging, and perhaps even stressful, but, as discussed above, the standard under MCL 750.411i(1)(c) is whether defendant's conduct would cause a reasonable person in Myers's position to experience "significant mental suffering or distress that may, but not necessarily, require medical or other professional treatment or counseling." That standard was not met here, so defendant's conviction for aggravated stalking must be reversed.

## B. USING A COMPUTER TO COMMIT A CRIME

Defendant likewise contends that there is insufficient evidence to support his conviction of using a computer to commit a crime because he did not commit the underlying offense of aggravated stalking. We agree.

MCL 752.796(1) provides, in relevant part:

> A person shall not use a computer program, computer, computer system, or computer network to commit, attempt to commit, conspire to commit, or solicit another person to commit a crime.

In this case, defendant was convicted for using his smart phone to commit the crime of aggravated stalking by sending text messages to Myers after she told him to stop. As previously discussed, we conclude that there was insufficient evidence that defendant's conduct met the definition of stalking under Michigan law. Therefore, our reversal of defendant's conviction for aggravated stalking mandates reversal of his conviction for using a computer to commit a crime.

The prosecution argues that even if the evidence were insufficient to convict defendant of aggravated stalking, defendant's conviction for using a computer to commit a crime should be affirmed. However, the prosecution fails to explain how the evidence here could sustain the second conviction if it could not sustain the first. Moreover, the prosecution fails to identify any other "crime" defendant used a computer to commit. Accordingly, because there was insufficient evidence, we reverse defendant's conviction for using a computer to commit a crime.

## IV. CONCLUSION

We reverse defendant's convictions and remand to the trial court for entry of judgments of acquittal as to both charges. We do not retain jurisdiction.

/s/ Daniel S. Korobkin
/s/ Thomas C. Cameron
/s/ Christopher M. Murray